## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

I, Marc Maurino, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.  I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(l)(A), 2703(c)(l)(A), and Federal Rule of Criminal Procedure 41 for location information pertaining to the cellular device assigned cellular telephone number 203-202-4376 (the "TARGET PHONE") and to authorize law enforcement to employ an electronic investigative technique, which is described in Attachment C, to determine the location of the TARGET PHONE. The service provider for the TARGET PHONE is T-Mobile USA, Inc. ("T-Mobile") with offices located in Parsippany, New Jersey. As a provider of wireless communications service, T-Mobile is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15).

2.  The primary user of the TARGET PHONE is believed to be Alec DIAZ, a person to be arrested within the meaning of Federal Rule of Criminal Procedure 41(c)(4). The property to be searched is described in the following paragraphs and in Attachment A. The information and records to be seized are described herein and in Attachment B, but in general terms pertain to data regarding the historical location data and prospective physical location of the TARGET PHONE for a period of thirty days.

3.  Because this warrant seeks the prospective collection of information, including cell site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the United States is seeking by separate contemporaneous application an Order issued pursuant to the Pen Register Act for the TARGET PHONE. *See* 18 U.S.C. §§ 3121-3127.

4.  The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is investigating the whereabouts of Alec DIAZ to arrest him on an outstanding federal arrest warrant issued in the District of Vermont. A warrant was issued for Alec DIAZ's arrest pursuant to indictment for violations of conspiracy to distribute Schedule II controlled substances, involving over 280 grams or more of a substance containing cocaine base, in violation of 2 1 U.S.C. §§ 846, 841(a), and knowingly possessing firearms in furtherance of drug trafficking crimes in violation of 18 U.S.C. § 924(c)(1)(A)(i).

5.  Based on the facts set forth in this affidavit, there is probable cause to believe that DIAZ is the user of the TARGET PHONE, and that DIAZ has used and will likely continue to use the TARGET PHONE. There is also probable cause to believe that the location information for the TARGET PHONE will assist investigators in executing the arrest of DIAZ pursuant to a federal warrant for his arrest.

6.  One purpose of applying for this warrant is to determine with precision the TARGET PHONE's location. However, there is reason to believe the TARGET PHONE is currently located somewhere within this district because, as described more fully below, a law enforcement confidential source provided information that DIAZ has been the primary user of the phone for an extended period of time, they knew DIAZ to be using the phone in the District of Vermont as recently as May 2025, and investigators have reason to believe that DIAZ is regularly within the District of Vermont to distribute controlled substances.

7.  In the course of this investigation, I prepared a federal search warrant which was signed on February 24, 2025, by the Hon. Jerome Niedermeier, U.S. Magistrate Judge in the District of Vermont, which summarizes and contains information relevant the investigation into

DIAZ and others through the date of the affidavit. A true and accurate copy of this affidavit is attached as Exhibit 2, and is fully incorporated herein.[1]

8.  The agencies participating in this investigation related to this affidavit include the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), the Bennington (Vermont) County Sheriff's Department (BCSD), and by extension, the Vermont Drug Task Force (VDTF), and the Bennington (Vermont) Police Department (BPD). Titles of investigators vary by agency, assignment, and rank, but for the purposes of this affidavit, law enforcement personnel will be referred to as "investigators."

9.  Because this affidavit is meant to set forth probable cause to believe that the violations described occurred and that the warrant for which I am applying will assist in the apprehension of a person to be arrested, it does not include every fact known to law enforcement about the events described below. The information contained within this affidavit is based upon my training and experience, upon my own investigative efforts, and upon investigation by other law enforcement officers with whom I have spoken or whose reports I have reviewed. Unless otherwise specified, the statements described in the following paragraphs are related in sum and substance and are not meant as direct quotations or complete descriptions.

## JURISDICTION

10. This Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

---

[1] Exhibit 2, both at the time of its signing and currently attached, incorporated Exhibit 1, an affidavit of Det. Cory Kingston.

## PROBABLE CAUSE

11.    On May 14, 2025, a federal Grand Jury in the District of Vermont indicted Alec DIAZ for conspiracy from June 2023-January 2025, to distribute Schedule II controlled substances, involving over 280 grams or more of a substance containing cocaine base, in violation of 21 U.S.C. §§ 846, 841(a), and knowingly possessing firearms in furtherance of drug trafficking crimes in violation of 18 U.S.C. § 924(c)(1)(A)(i). A federal arrest warrant was issued related to that indictment. DIAZ also currently has two open warrants in the state of Massachusetts, one from Springfield District Court for firearms possession, which was issued on February 12, 2025, and the other from Eastern Hampshire (MA) District Court for assault with a dangerous weapon (handgun) and threatening, which was issued after he failed to appear for a hearing on February 25, 2025.

12.    DIAZ has not yet been arrested on any of these warrants. Since his federal indictment, investigators in the District of Vermont, where DIAZ has been known to stay for periods of time to distribute narcotics, as well as in the District of Massachusetts, where DIAZ is believed to have family and/or have previously resided, have made numerous attempts to locate DIAZ, including conducting surveillance on associated residences and utilizing a remote surveillance camera ("pole cam") outside a residence believed to be a location he is using for narcotics distribution.

13.    To date, law enforcement has not had success in locating DIAZ. However, following DIAZ's indictment, investigators received information from a co-conspirator who provided information identifying the TARGET PHONE and regarding DIAZ's possible whereabouts.

14.    This individual, whose identity is known to me, but who will be referred to as

Confidential Source-1 ("CS-1") in this affidavit to protect their safety was questioned by myself and Det. Cory Kingston on two occasions, once in May 2025 and again in June 2025.

15.   CS-1 identified an unmarked photo of Alec DIAZ as the man they know as "Jose" or "Benn Tenn." CS-1 stated that they had interacted with DIAZ, and his associates, numerous times over the past two years and assisted them in the distribution of controlled substances. Through these interactions, CS-1 has learned substantial information about DIAZ and his drug trafficking operation, and his patterns and practices. CS-1 provided detailed information about DIAZ and his associates. Investigators have been able to corroborate many of these pieces of information with other information learned in this investigation. As a result of this corroboration, I believe that the information that CS-1 provided to investigators regarding DIAZ is credible.

16.   CS-1 stated that by late 2024 to early 2025, they primarily maintained contact with DIAZ through text messages and phone calls. In earlier timeframes they had also communicated via Facebook Messenger. CS-1 stated that DIAZ's number was saved in their phone. CS-1 provided consent for me to examine and search the content of CS-1's phone. I located a contact in the phone named "My Boy Jose." CS-1 confirmed that the contact, "My Boy Jose" referred to DIAZ and the number associated with that contact was how CS-1 maintained contact with DIAZ from late 2024 through to the time of my initial interview with CS-1 in May 2025. The number associated with the contact "My Boy Jose" is the number of the TARGET PHONE.

17.   During their second interview with investigators, CS-1 was asked when the last time they used that number to contact DIAZ was, and CS-1 stated that it was right before CS-1's first interview with investigators during the week ending May 3, 2025. CS-1 stated that shortly

5

before that interview they shared the number for the TARGET PHONE with a personal contact of theirs, and that the contact then used the number to arrange a purchase of cocaine base from DIAZ in CS-1's presence.

18. CS-1 stated that following that telephone call they went to a residence on Center Street in Pownal, Vermont with their acquaintance to complete the purchase of cocaine base. CS-1 stayed in the vehicle while the acquaintance, who was also familiar with DIAZ, went inside and completed the transaction. CS-1's acquaintance confirmed to CS-1 that DIAZ himself was at the residence on Center Street, Pownal, Vermont, to complete the transaction. CS-1 had identified this residence as a possible location where DIAZ may be using to sell controlled substances during their first interview. Det. Kingston showed CS-1 a photo of the house we believed they had identified, and CS-1 confirmed this was the location being discussed.

19. Following our first interview with CS-1, I arranged for a pole camera to be surreptitiously installed outside of that residence located on Center St., Pownal, Vermont, and have monitored that camera intermittently since its installation. Unfortunately, due to the placement of the camera, which does not capture the front door to the residence and has numerous obstructions to viewing individuals that come and go from the residence, I have not yet observed DIAZ at this residence.

20. However, I also know from CS-1's information and information for other sources in this investigation that DIAZ is very security conscious, and he rarely leaves the residences from which he operates and instead has "runners" conduct his drug transactions while staying inside a room within the residence. CS-1 also stated that DIAZ would often plan his arrival or departure from the residences from which he operated during night time hours to limit the effectiveness of surveillance in positively identifying him.

21. On June 6th, 2025, I utilized my undercover telephone to text TARGET PHONE to determine if it was still active. I texted two messages in rapid succession, "hey is this still jose" and "lost my phone", the latter to imply that was why I was checking if this number was still "Jose's"/DIAZ's.

22. Approximately forty minutes later, I received four messages from TARGET PHONE in rapid succession:

> "Whos this" *(sic)*
>
> "Go who is thisb" *(sic)*
>
> "?"
>
> "Yo who the fuck is this"

23. I did not respond to any of these texts. I then quickly received two attempted FaceTime calls from TARGET PHONE, neither of which I answered, and neither of which left a message. Based on my training and experience, I know that sophisticated drug dealers often want to see the people with whom they are communicating, hence the attempted FaceTime calls.

24. I also know that generally, cell phone users who receive texts such as those that I sent in an undercover capacity ("hey is this still jose") that the receiver believes to be sent to them in error, might simply ignore the text; or they might advise the text-sender that "no, this isn't Jose" or "wrong number".

25. However, based on my training and experience I believe that the rapid texts demanding to know my identity, and repeated FaceTime efforts to get me to respond, are not indicative of a simple response to a wrong-number text, but in fact reflect a suspicious, sophisticated individual – such as DIAZ – who may want to know who has gotten his phone number.

7

26.   In the course of reviewing usage data for TARGET PHONE for the time period of May 18 through June 18, 2025, that was received from T-Mobile pursuant to a subpoena, I observed that there appeared to be 629 unique contacts with other telephone numbers, based on my review and understanding of the data provided by T-Mobile. Of those 629 contacts, I further analyzed that 327 of them appeared to be to or from accounts bearing an 802 area code (Vermont's area code). This which bolsters my belief that DIAZ is using this number as a means of communicating with drug customers in the Bennington area.

27.   Based on the above, as well as my training, experience, and familiarity with this investigation, which has included interviews with numerous individuals who have admitted either purchasing controlled substances from DIAZ or assisting him with the distribution of controlled substances in the District of Vermont since at least 2022, I believe that he continues to distribute controlled substances to his customers in the District of Vermont as it is a source of considerable income for DIAZ. I believe the TARGET PHONE has been and will continue to be used by DIAZ. I believe that he has used this phone number to continue the activity for which he has been indicted, to wit, using TARGET PHONE to arrange a sale to CS-1's personal contact; and I further believe that obtaining the specific location information for the TARGET PHONE will assist investigators in locating and apprehending DIAZ.

### INFORMATION REGARDING CELLULAR SERVICE PROVIDERS

28.   In my training and experience, I have learned that T-Mobile is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records."

Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

29.     Cellphones and other cellular capable mobile devices, such as tablets, wearable smart devices, and cellular-supported vehicles, contain antennas that allow the devices to communicate with the cellular network provided by cellular service providers. Customers can subscribe to a cellular service provider by prepaying for a finite amount of usage or by entering a contract. Account subscribers are then issued a phone number and/or International Mobile Subscriber Identity (IMSI) that are some of the components in which they are identified on the cellular network. When a mobile device is powered on, regardless of whether being actively used by a person, the device continuously searches for the strongest cellular signal so that the user can enjoy continuous cellular connectivity. When a wireless device user either initiates or receives a voice call or text message, or a data session is initiated by the device, the device transmits signals to the cell sites that route its communication. These transmitted signals include a cellular device's unique identifiers as well as details about the usage event.

30.     Cellular service providers collect and store these usage event details (transaction records) associated with cellular phone numbers and/or IMSIs during their normal course of business. The usage event records, commonly referred to as call/communication detail records (CDRs) stored by the respective cellular network provider, mostly contain the following information: date, time, type of event, duration, phone number initiating the usage event (called,

9

calling) text message transaction data, the international mobile equipment identifier (IMEI), the international mobile subscriber identifier (IMSI), IP packet data session logs, and cell site location (CSLI) and sector information at the beginning and ending of each usage event. I know the CSLI does not provide an exact location of a mobile device, rather only the physical location of the cell site and the direction the antennas are facing.

31. Based on my training and experience, I know that T-Mobile can collect cell-site data on a prospective basis about the TARGET PHONE. Based on my training and experience, I also know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

32. Cellular service providers also maintain specialized location records consisting of engineering data. This data is used to troubleshoot coverage areas and report back on potential dead spots, all with the intent to oversee and optimize the cellular network. These records not only include the basic call detail records, but also an estimation of the target device's location with a possible accuracy radius and/or the distance from the cell site at the time of the usage event. Specialized location records can provide investigators with a much smaller footprint of a target device's location.

33. Cellular providers use a variety of terms to refer to this network timing advance or distance-to tower network information, including Sprint's Per Call Measurement Data, Verizon's Real Time Tool, AT&T's Network Event Location System, and T-Mobile's True Call. Carriers are able to provide this data at regular intervals to law enforcement for both historical and prospective service.

34. Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers-as transmitted from a cellular device to a cellular antenna or tower--can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

35. Based on my training and experience, I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name, address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my

11

training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the TARGET PHONE's user or users and may assist in the identification of co-conspirators and/or victims.

## USE OF CELL-SITE SIMULATOR

36. To facilitate execution of this warrant, law enforcement may use an investigative device or devices capable of broadcasting signals that will be received by the TARGET PHONE or receiving signals from cellular devices, including the TARGET PHONE. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others. The device may send a signal to the TARGET PHONE and thereby prompt it to send signals that include the unique identifier of the device. Law enforcement may monitor the signals broadcast by the TARGET PHONE and use that information to determine the TARGET PHONE's location, even if it is located inside a house, apartment, or other building.

37. The investigative device may interrupt cellular service of phones or other cellular devices within its range. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices. In order to connect with the TARGET PHONE, the device may briefly exchange signals with all phones or other cellular devices in its range. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be the TARGET PHONE, and law enforcement will limit collection of information from devices other than the TARGET PHONE. To the extent that any information from a cellular device other than the TARGET PHONE is collected by the law enforcement device, law enforcement will delete that

information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the TARGET PHONE from all other cellular devices.

## CONCLUSION AND REQUESTS

38. In conclusion, there is probable cause to believe, and I do believe, that the records and information requested, and the investigative technique described in Attachment C, will assist law enforcement in locating ALEC DIAZ so that he may be taken into custody.

39. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41.

40. I additionally request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days from the end of the period of authorized surveillance. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the TARGET PHONE would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1).

41. As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrants do not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic

information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

42.    I further request that the Court direct T-Mobile to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B. I further request that the Court direct T-Mobile to furnish the government with all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the TARGET PHONE on T-Mobile's network or with such other reference points as may be reasonably available, at such intervals and times directed by the government. The government shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

43.    I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the TARGET PHONE outside of daytime hours.

Dated at Burlington, in the District of Vermont, this 26th day of June 2025.

/s/ Marc Maurino
MARC MAURINO
ATF Special Agent

Attested to by the applicant in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 by Facetime call on June 26, 2025.

HONORABLE KEVIN J. DOYLE
United States Magistrate Judge
District of Vermont